# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0025V
UNPUBLISHED

| | |
|---|---|
| LEXI KESTNER,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: February 3, 2023<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza Vaccine;<br>Shoulder Injury Related to<br>Vaccine Injury (SIRVA) |

*Anne Carrion Toale*, Maglio Christopher & Toale, PA, Sarasota, FL, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION AWARDING DAMAGES**[1]

On January 8, 2020, Lexi Kestner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on October 4, 2017. Petition at ¶24. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although Ms. Kestner was found entitled to compensation, the parties were unable to agree to damages. ECF No. 28.

For the reasons discussed below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of $115,502.58, representing $115,000.00 in pain and suffering, plus $502.58 in unreimbursed mileage expenses.

---

[1] Although this Decision has been deemed unpublished, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I.     Relevant Procedural History

Approximately 17 months after this case was initiated, Respondent filed his Rule 4(c) Report on June 4, 2021, conceding that Petitioner was entitled to compensation. ECF No. 37. A ruling on entitlement was subsequently issued on the same day. ECF No. 38. On April 22, 2022, Petitioner filed a status report indicating that the parties had reached an impasse. ECF No. 58. Petitioner filed a Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Mot.") on June 24, 2022. ECF No. 59. Responded filed a response ("Resp.") on August 24, 2022 (ECF No. 60) and Petitioner filed a reply ("Repl.") on September 12, 2022. (ECF No. 61). I subsequently proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed issues. ECF. No. 362. That hearing was held on January 27, 2023,[3] and the case is now ripe for a determination.

### II.     Relevant Medical History

Ms. Kestner was a 26-year-old nurse when she received an influenza vaccine in her left shoulder on October 4, 2017. Ex 1 at 2. Petitioner stated that the injection hurt when it was administered, and that she "noticed that the needle was injected higher on her shoulder than when she'd received it in the past." Ex. 10 at ¶5-6.

On October 20, 2017, 16 days after her vaccination, Petitioner was evaluated by an occupational physician at the hospital where she worked. Ex. 6 at 4. She reported pain with movement which caused difficulty with daily activities and interfered with sleep. *Id.* Petitioner was instructed to return to work with restrictions. *Id.* Three days later, Ms. Kestner was evaluated by orthopedist, Dr. Nikhil Verma, who diagnosed bursitis and administered a steroid injection. Ex. 3 at 91.

Although Petitioner initially reported that her pain had fully resolved after the steroid injection, that relief lasted only 2-3 weeks. Ex. 3, at 88; Ex. 6 at 6. At a follow-up appointment, she reported pain between 3/10 and 6/10, but stated that she could move her arm "fairly well without pain." Ex. 6 at 6. Petitioner was allowed to return to full duty at work. *Id.* Dr. Verma prescribed a Medrol Dosepak and referred Petitioner to physical therapy. Ex. 3 at 88.

Petitioner began physical therapy on November 15, 2017. Ex. 2 at 111. She reported pain between 2/10 and 6/10 and difficulty with self-care, dressing, reaching into

---

[3] At the end of the hearing held on January 27, 2023, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

2

cabinets and cleaning her home. *Id.* She returned to Dr. Verma on December 7, 2017 with complaints that her work duties were exacerbating her pain. Ex. 3 at 87. Dr. Verma ordered an MRI[4] and ordered Petitioner to remain out of work for one week. *Id*.

On December 11, 2017, Dr. Verma ordered Petitioner to remain out of work for an additional two weeks and prescribed a course of daily anti-inflammatories. Ex. 3 at 81. Nine days later, Petitioner returned reporting that physical therapy, which she had done for seven sessions, was aggravating her symptoms. *Id.* at 77. Dr. Verma ordered Petitioner to refrain from working for three additional weeks. *Id.* Petitioner returned to Dr. Verma in January 2018 reporting no improvement in symptoms. Ex. 3 at 73. Dr. Verma recommended a left shoulder arthroscopy with subacromial bursectomy, which was performed on February 1, 2018. *Id*. at 31-32.

At a follow-up appointment two weeks after her surgery, Petitioner reported doing "significantly better." Ex. 3 at 96. She was not taking medications for pain. *Id.* Dr. Verma referred her back to physical therapy and released her to work on limited duty. *Id*. Two months later, Petitioner reported that her pain was improving. Ex. 3 at 66. Dr. Verma advised that she continue physical therapy and released her to return to full duty at work. *Id*.

On June 1, 2018 (now approximately eight months after her vaccination), Petitioner was discharged from physical therapy after 29 sessions. Ex. 2 at 3. She reported no difficulty with her work duties and 95% improvement in her symptoms. *Id.* Three months later, in September 2018, Petitioner retuned for treatment reporting intermittent shoulder pain since her surgery, with acute pain resuming 2-3 days prior. Ex. 3 at 58. She reported pain between 2/10 and 4/10 that worsened with driving and certain movements and interfered with her sleep. *Id.* She was prescribed a Medrol Dosepak. *Id.*

Although there are no treatment records relating to Petitioner's shoulder after September 2018 (11 months after her vaccination), Petitioner states that she continues to have tightness and pain in her shoulder, especially at the end range of motion. Ex. 10 at ¶25. Petitioner also described the impact of her injury on her wedding on March 30, 2019, stating that it was hard not to stress about weight gain pre-wedding because she could not exercise with her shoulder injury and that her surgery scars were visible in her dress. *Id*. at ¶28.

---

[4] Petitioner's December 8, 2017 MRI revealed "a small labral tear with a 6mm anterior paralabral cyst" and "no significant joint bursal effusion." Ex. 3 at 102. Dr. Verma noted that the MRI showed "no profound findings of subacromial bursitis or rotator cuff pathology." *Id*. at 81.

### III. The Parties' Arguments

#### a. Petitioner

In addition to a more nominal past unreimbursed expense (discussed briefly below), Ms. Kestner seeks $135,000.00 as compensation for her actual pain and suffering. Br. at 14. She argues that her SIRVA injury forced her to seek treatment quickly after her vaccination, and was severe enough that she was unable to work for a long period of time. *Id.* at 15. She highlights her significant pain (rated between 2/10 and 6/10, with at least one report of 10/10) and that she required robust treatment, including a cortisone injection, 35 physical therapy treatments (3 pre- and 29 post-surgery), and a surgical procedure. *Id.* Further, even after her surgery she required additional treatment, and today continues to suffer symptoms, including difficulty sleeping due to pain. *Id.*

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with similar fact patterns and argued that an award of $135,000.00 in pain and suffering was reasonable and appropriate given that her circumstances were comparable. *See* Br. at 14-15.

#### b. Respondent

Respondent maintains that a pain and suffering award of $87,500.00 is appropriate. Resp. at 12. Respondent contends that Petitioner's injury was modest – as her initial presentation was not severe and she had complete resolution of pain after a cortisone injection. *Id.* at 8. He highlights that Petitioner experienced only minor deficits in range of motion throughout her injury and that her symptoms were largely resolved after eight months. *Id.* at 8-9. He also distinguished Petitioner's cited prior SIRVA case, arguing that that petitioner had a more severe injury and during the hearing and in his brief, discussed other prior SIRVA cases as the basis for his proposed pain and suffering award. Resp. at 10-12. And he does not concede that a case involving surgery should inevitably result in a pain and suffering award in excess of $100,000.00.

### IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on

4

behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *See Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* decision maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

5

suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* does not control the outcome of this case, it provides logical guidance that bears on how pain and suffering is calculated.

### V.     Prior SIRVA Compensation Within SPU[6]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[7]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

---

[6] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *88* | *1,223* | *28* | *967* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate

---

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI.     Appropriate Compensation in this SIRVA Case

### a.  Awareness of Suffering

Awareness of suffering is not typically a disputed issue in cases involving SIRVA – and it does not appear to be here either. Neither party has argued that Ms. Kestner lacked awareness of her injury, thus, I find that Petitioner had full awareness of her suffering.

### b.  Severity and Duration of Pain and Suffering.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that Petitioner's injury was consistent with a moderate SIRVA requiring surgery. Petitioner sought treatment quickly after her vaccination, and consistently reported pain levels 2/10 and 6/10 prior to her surgery. Ex. 2, at 11; Ex. 6 at 4, 6. She received a cortisone injection at her first orthopedist appointment, was prescribed medications, and completed seven physical therapy sessions prior to her surgery, stopping because the treatments were aggravating her pain. Ex. 2 at 111; Ex. 3 at 77, 87-91. Petitioner underwent surgery four months after her vaccination, after which her recovery was good. Ex. 3 at 31-32. She attended 29 sessions of physical therapy and

two follow up appointments with her orthopedist. Ex. 2 at 3; Ex. 3 at 66; 96. She reported 95% improvement upon her discharge from physical therapy, four months after surgery. Ex. 2 at 3. Her total course of treatment spanned eight months. Ms. Kestner returned to her doctor three months after her discharge from physical therapy complaining of ongoing, intermittent shoulder pain, but did not have significant additional treatment and did not seek care again. Ex. 3 at 58.

In her argument, Petitioner cited a case that is in many regards factually similar: *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008, *1 (Fed. Cl. Spec. Mstr. Sept. 6, 2019). The *Nute* petitioner was a nurse, like Ms. Kestner, and was awarded $125,000 for her SIRVA injury. *Nute*, 2019 WL 6125008 at *1. Petitioner argues that her injury was more serious than the *Nute* petitioner's, however, because she sought treatment sooner, missed more days of work due to her injury, had more physical therapy, required follow-up care for chronic symptoms, and suffered a significant life impact of her in injury with respect to her wedding planning. Br. at 15-16. But despite its many similarities, Respondent made persuasive arguments for distinctions between *Nute* and the present case. The *Nute* petitioner received more cortisone injections, reported higher levels of pain than did Ms. Kestner prior to surgery, and experienced much more reduced range of motion. *Nute*, 2019 WL 6125008 at *3. And although the treatment course in *Nute* was comparable, Ms. Nute's surgery was more extensive, and her post-surgery PT course was more difficult and painful than was Ms. Kestner's. *Id*. at *4. For these reasons, Petitioner's requested award is just too high.

Respondent cited three comparable prior SIRVA cases in support of his proposed award of $87,500 - two of which did not involve surgery. *See Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018). Although Respondent's proposed award was higher than the awards in those cases (in an attempt to account for Petitioner's surgery), his proposed number still remains somewhat too low. A number of factors (including the speed of treatment, the number of physical therapy sessions, the number of steroid injections, and the impact of an injury on the petitioner's employment and activities) are routinely considered in the determination of the severity of a SIRVA injury, but surgery is consistently, and reasonably, deemed a particularly compelling justification for an award of pain and suffering in excess of $100,000.00, absent other considerations.

Respondent also cited *Shelton v. Sec'y of Health & Human Servs.*, No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) – the rare SIRVA injury case involving surgery but resulting in a sub-$100,000.00 pain and suffering award (there, $97,500). Respondent argues that Ms. Kestner's course of treatment, including her

9

surgery, were even less severe than the petitioner in *Shelton* and therefore justifies a lower award. Resp. at 11. However, the primary reason for the lower award in *Shelton* was that petitioner's eight-months substantial delay in seeking treatment post-vaccination. *Shelton*, 2021 WL 2550093 at *7. This fact was balanced against the fact that the *Shelton* petitioner ultimately underwent a fairly rigorous treatment course, including surgery. This case does not present a similar need to balance some factor undermining severity of injury.

Although the parties overall cited reasonable comparable cases, I deem the present action most factually similar to a different recent case: *Wylie v. Sec'y of Health & Human Servs.*, No. 20-1314V, 2022 WL 17968929 (Fed. Cl. Spec. Mstr. Dec. 7, 2022). The *Wylie* petitioner sought treatment within a month of vaccination, reported fairly severe pain, and had 14 physical therapy treatments prior to surgery. *Wylie,* 2022 WL 17968929, at *5. She had a successful surgery eight months after her vaccination and made an excellent recovery after 18 post-surgery physical therapy treatments, reporting 95% improvement upon discharge. *Id.* at 6. Her total treatment course was just over ten months, and she was awarded $108,000 in pain and suffering. *Id.* at *7. The degree of factual similarity between the treatment course of the *Wylie* petitioner and Ms. Kestner's course suggests an award of pain and suffering in the same range. However, my award will be somewhat higher, because Ms. Kestner required more post-surgery physical therapy, returned with ongoing symptoms, and persuasively described the impact of her injury on her professional and personal life. And I give some weight to the commonalities between this case and those found in *Nute* (even though the latter award exceeds what is appropriate here).

Accordingly, and considering the arguments presented by both parties at the hearing, a review of the cited cases, and the record as a whole, I find that **$115,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### c. Award for Past Unreimbursed Expenses

The parties have agreed that Petitioner should be awarded $502.58 in past unreimbursable mileage expenses. Petitioner is awarded this sum without adjustment.

### CONCLUSION

Based on the foregoing, the I award **Petitioner a lump sum payment of $115,502.58, (representing $115,000.00 for Petitioner's actual pain and suffering and $502.58 for unreimbursable mileage expenses) in the form of a check payable to Petitioner, Lexi Kestner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.